## WILPUTTE COKE OVEN CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74775. Promulgated January 21, 1937.

*Hugh Satterlee, Esq.*, for the petitioner.
*John H. Pigg, Esq.*, for the respondent.

OPINION.

DISNEY: The respondent determined a deficiency in income tax for the year 1930 in the amount of $10,285.72, which is controverted by the petitioner.

The error assigned by petitioner is that the respondent refused to allow as a deduction an item of depreciation of certain patents assigned to the petitioner for a valuable consideration and not as a gift.

The petitioner is a Maine corporation, organized about 1923, with its principal office in New York, New York. It succeeded to all the assets, business, and liabilities of a Delaware corporation of the same name organized about 1917. At all times material to this proceeding, prior to the sale thereof by them in January 1928, Louis Wilputte and his wife, Alice A. Wilputte (the two hereinafter sometimes referred to as the Wilputtes), were the owners of all of the petitioner's outstanding capital stock, consisting of 340 shares of no par value, of which one share each stood in the names of Alan Fox and Robert Metcalfe, directors of the petitioner, the only other director being Louis Wilputte, its president. The business of petitioner during 1930 and prior years was the building of byproduct coke ovens or supplying engineering services in designing coke ovens and supervising their construction. The type of byproduct coke oven here involved is well known in this country and in foreign countries as the "Wilputte Oven" and is completely covered by patents, which, prior to their assignment to the petitioner in January 1928 were owned jointly by Louis Wilputte and wife, Alice A. Wilputte. In consideration of license granted by them to the petitioner to operate under aforesaid patents, the petitioner paid license fees or royalties to the Wilputtes.

In the early part of December 1927, J. E. Lewis, who was engaged in the manufacture of brick and refractory materials used in the construction of coke ovens and from whom petitioner had theretofore bought quantities of those materials, began negotiations with Louis Wilputte with a view to securing the exclusive right to promote the sale of the "Wilputte Oven" and build that type of oven.

At the time negotiations were going on, the liquid assets of the petitioner had a value of approximately $515,000. Lewis desired to acquire complete control of the "Wilputte Oven" and the name and good will of the petitioner, but not its liquid assets. About the 15th or 20th of December 1927, Lewis made Wilputte an offer which, as originally expressed in general terms, provided that Lewis should pay the Wilputtes $575,000 and they should assign, to Lewis or whomever he might designate, the numerous Wilputte patents, all of which stood in the Wilputtes' individual names. It was agreed between Lewis and Louis Wilputte that all the outstanding stock of

petitioner would be transferred by the Wilputtes to and become the property of Lewis, but that before the stock was "turned over" to Lewis, the Wilputtes would have the right to take out the liquid assets of approximately $515,000 value, which constituted practically the working capital of the petitioner. During negotiations there were also discussions of the best method and means of effecting the transaction so as to produce the least tax liability.

The plan considered and adopted for the purpose of divesting the petitioner of its liquid assets for the benefit of its stockholders was the organization of a subsidiary company to which the liquid assets would be transferred in consideration of the issuance to the petitioner of capital stock of the subsidiary; the petitioner, in turn, to distribute the subsidiary's stock to its own stockholders. It was finally agreed that the Wilputtes would assign the patents to the petitioner and that the outstanding capital stock of the petitioner would then be sold by the Wilputtes to Lewis for a consideration of $575,000. The final written contract contained such provisions.

The negotiations and agreements above outlined were carried out and culminated in the acquisition by Lewis of the entire outstanding stock of the petitioner and the consequent control of the Wilputte patents.

On December 31, 1927, the petitioner's only assets of any consequence other than good will (which Lewis acquired) consisted of its aforesaid liquid assets of the approximate value of $515,000 and some office furniture and fixtures and some secondhand construction equipment scattered over the country, all of which had a value of approximately $25,000.

At a meeting of the board of directors of petitioner held on January 3, 1928, the following resolutions were unanimously adopted:

WHEREAS, Mr. Louis Wilputte and Mrs. Alice A. Wilputte have heretofore owned the so-called "Wilputte" patents on coke ovens and accessories upon which the business of the Company depends, and the company has been in the habit of paying to Mr. and Mrs. Wilputte large annual royalties for the use of such patents, and,

WHEREAS, Mr. and Mrs. Wilputte have now assigned all such patents to this Company,

RESOLVED, That the Treasurer of this Company be and is authorized and directed to assign to such patents on the books of the Company a value of $400,000.

WHEREAS, The Company has certain cash, securities and receivables which the Company is of opinion may better be handled through a subsidiary of the Company,

RESOLVED, That the Company cause to be organized under the laws of Delaware a subsidiary company for the holding of certain of its assets, to be called the Willdell Corporation, and having an authorized capital of 500 shares of no par value.

RESOLVED, That this Company transfer to such Willdell Corporation in exchange for 340 shares of its authorized stock the cash, securities and receivables which the Company owned at the close of business on December 31, 1927, a list of which is hereto attached as Schedule A.

RESOLVED, That after this Company shall have received all such issued stock of the Willdell Corporation it distribute such stock to the stockholders of this corporation in the proportion in which the stockholders of our Company now hold our stock

The patents here involved were transferred to petitioner by the Wilputtes by written assignment, reciting "in consideration of one dollar and other good and valuable consideration", on January 3 or 4, 1928, though not delivered until January 17 or 18, 1928. The organization of the subsidiary corporation, the Willdell Corporation, under the Delaware laws was not completed until on or about January 17, 1928. The Willdell Corporation is merely a holding corporation for the Wilputtes.

The final agreement between Wilputte and Lewis, under the terms of which the latter purchased the entire outstanding capital stock of the petitioner, was executed on January 18, 1928, and in part and in so far as material to the issues here is, literally or in substance, as follows:

WHEREAS, Wilputte Coke Oven Corporation, hereinafter called the Company, a corporation of the State of Maine, has an authorized capital stock of one thousand (1,000) shares of no par value, of which three hundred and forty (340) shares are outstanding, and Mr. Lewis desires to acquire all of the capital stock of the Company; and,

WHEREAS, the Company heretofore transferred to a Delaware corporation certain cash, securities and receivables which it had on December 31, 1927, in exchange for stock of such Delaware corporation and has since distributed such Delaware corporation stock to the stockholders of the Company;

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS HEREIN CONTAINED THE PARTIES HERETO COVENANT AND AGREE AS FOLLOWS:

1. Wilputte will immediately sell and transfer or cause to be sold and transferred to Lewis all of the said 340 shares of the outstanding capital stock of the Company. Wilputte warrants that the said stock is full paid and nonassessable and is all of the capital stock issued and outstanding. * * *

2. Lewis will pay for such stock as follows:

(a) One Hundred and Seventy-five Thousand Dollars ($175,000.00) in cash upon the execution and delivery of this agreement.

Further conditions of the contract provided for payment of $400,000 additional, evidenced by promissory notes, pledge of the 340 shares of stock for payment thereof, payment of all indebtedness by Wilputte, delivery by Wilputte of resignations of all company officers and directors except himself, employment of Wilputte as president and general manager for five years, and that the company should benefit by any inventions made by Wilputte.

Lewis paid the Wilputtes the $575,000 purchase price of the stock agreed on, the payments being made either before or when due. The

patents, upon their assignment to the petitioner, were set up on its books at a valuation of $400,000 and the good will of the petitioner was considered to have a value of $175,000.

The petitioner's income tax return for the year 1930 disclosed a gross income for that year of $224,940.07, and a net income of $57,423.51. In arriving at the said amount of net income, the petitioner claimed net loss deductions for the years 1928 and 1929 in the respective amounts of $134,820.06 and $32,696.50, which amounts were reported as net losses in its returns for those years. In each of its returns for 1928, 1929, and 1930 the petitioner claimed a deduction of $28,571.43, as and for depreciation or amortization of the patents which it acquired by assignment, under the circumstances hereinabove set forth. These deductions are reflected in the amounts of the net losses as disclosed by the petitioner's returns for the years 1928 and 1929, and the net income as disclosed by its return for the year 1930.

In his determination of the deficiency involved, the respondent disallowed the patent depreciation or amortization deductions so claimed by the petitioner for the years 1928, 1929, and 1930. The effect of that disallowance is to reduce by the amount of $28,571.43 the net losses as reported by the petitioner for each of the years 1928 and 1929, and to increase the taxable net income as reported by the petitioner for the year 1930 by an aggregate amount of $85,714.29.

In the individual tax returns of the Wilputtes for the year 1928, there is no report of any sale of the "Wilputte" patents. In schedule "D" of their respective individual returns for the year 1928, the Wilputtes reported sale of "stock" acquired in 1917 and sold in 1928 as follows: By Louis Wilputte, stock costing $32,980.31, sold for $133,823.55, gain $100,843.31; by Alice A. Wilputte, stock costing $6,383.70, sold for $41,176.45, gain $34,792.75.

The total amount received by both the Wilputtes from the sale of stock in 1928 as reported by them in their returns for that year was $175,000, which is the same as the amount of the cash payment made by Lewis to them for stock upon the execution of the agreement of January 18, 1928. Neither of the returns for 1928 of the Wilputtes made any statement as to the number of shares of stock, the name of the corporation whose stock was sold, or how the cost of the stock sold was determined. These transactions must refer to the disposition by the Wilputtes of their stock in the petitioner during the year 1928, since otherwise there would be no return filed by them for that year of the sale shown in this case to have been made.

The facts in the instant case with respect to the transfer of the patents by the Wilputtes to the petitioner are, in our opinion, similar to the facts in the *Rosenbloom Finance Corporation* case, 24 B. T. A.

763; reversed, 66 Fed. (2d) 556; certiorari denied, 290 U. S. 692, wherein the question or issue was whether whisky warehouse certificates owned by said corporation, the taxpayer, were acquired by gift from its majority stockholder, Sol Rosenbloom. "No stock, money or other property was paid by petitioner (said corporation) to said stockholders as the consideration" for the transfers of the warehouse receipts or certificates, and, notwithstanding other facts and circumstances presented and pressed to show the transfers were not gifts, the Circuit Court of Appeals for the Third Circuit held the transfers constituted a gift. See also *King* v. *United States*, 79 Fed. (2d) 453. The *Rosenbloom* case does not support the contention of the petitioner, though cited by it as authority, but in our opinion sustains the determination of the respondent that the transfer of the patents by the Wilputtes to the petitioner herein was a gift. The petitioner's corporate resolution passed in January 1928, and set out herein, assigned a value of $400,000 to the patents, which valuation the petitioner in its 1928 tax return reported as "surplus."

It has been held that capital contributions or surplus paid in by a stockholder is to be considered as additional consideration for the stock issued to the person. *Estate of L. W. Mallory*, 27 B. T. A. 750; *Kistler* v. *Commissioner*, 58 Fed. (2d) 687; *W. F. Bavinger*, 22 B. T. A. 1239; *Burns* v. *Commissioner*, 31 Fed. (2d) 399; certiorari denied, 280 U. S. 564. If so, it is apparent that the patents transferred to the corporation herein should not be considered differently. The petitioner set them up as surplus at that time and under the above authority is in no position, at a later time when the present question arises, to contend that the patents were paid for. Indeed, upon brief petitioner admits and argues that the corporation paid nothing for the patents, but contends that Lewis paid for them and made a gift of them to the corporation, saying: "True, the company did not pay for the patents. The Government is correct in saying that they were 'donated' to the company. They were donated, however, by the man who had already bought or was in process of buying the company. Lewis, not Wilputte, was the donor." But it is clear that Lewis did not purchase the patents and did purchase the stock in petitioner. The final written contract between Wilputte and Lewis is very particular in that regard, reciting as a preliminary that Lewis "desires to acquire all the capital stock of the company"; further reciting that Wilputte will sell to Lewis "all the said 340 shares of the outstanding capital stock"; further reciting that "Lewis will pay for such stock as follows"; further reciting that as collateral security Lewis will pledge "said 340 shares of stock of the company which this day is being transferred to him." The contract contains

no provision for purchase of the patents by Lewis. It was made as of January 18. The affidavit of the Wilputtes, dated September 20, 1933, which is in evidence, likewise says that Lewis was to buy the stock of the company after the exchange had been made, that is, the exchange of the patents for the liquid assets of the corporation. The patents had been transferred by the Wilputtes to the petitioner on or before January 3, 1928, as indicated by the minutes of the meeting of the board of directors of that date, which recite that "Mr. and Mrs. Wilputte have now assigned all such patents to this company." The record contains an amendment of said minutes under date of September 19, 1933, to the effect that the patents were to be assigned in consideration of the distribution of the Willdell stock. This amendment, however, was attempted more than eight months later, and after the present question arose, and we can not allow it to control over the original record.

Lewis purchased the stock in a corporation to which the patents had been transferred. The Wilputtes reported a sale of stock and no sale of patents. We conclude that Lewis was not the donor, and that the patents passed to the corporation, either as a gift, or for a contention by petitioner that the patents were consideration for the paid nothing for the patents, petitioner, in a way, precludes itself from any contention that there was consideration . between the Wilputtes and the corporation. Nevertheless, the record contains contention by petitioner that the patents were consideration for the liquid assets distributed to the Wilputtes, and we proceed to examine this situation and question further.

What was the consideration, if any, for the transfer of patents? If there was such, petitioner's contention for a stepped-up base for depreciation purposes must be sustained. Any consideration came from the company, for we have held that Lewis did not buy the patents. What did the Wilputtes receive from the company which might constitute consideration for the transfer of their patents? They received nothing except a distribution of the stock of the company's subsidiary, the Willdell Corporation, which was distributed "in the proportion in which the stockholders of our company (i. e., the parent company) now hold our stock." The affidavit of the Wilputtes dated September 20, 1933, explains that "the corporation should declare a dividend." The Wilputtes received a dividend. Is this a consideration for the patents transferred? The Wilputtes reported nothing as income from such dividend, demonstrating that they (consistent with their affidavit above) regarded it as a non-taxable dividend and not a receipt of income from the sale or exchange of their patents. The statutory definition of dividend does not permit the inclusion of consideration for a transfer to a corporation, but is limited to earnings or profits accumulated after Febru-

ary 28, 1913. Sec. 115 (a), 1928 Act. Nor does logic approve an argument that a dividend may be the consideration for a transfer to a corporation, for a dividend is merely a proportionate distribution by virtue of the ownership of stock. The stockholder receives the distribution as such stockholder, and only by reason of such status. He can not be said to receive it in return for anything he has transferred to the company, or by virtue of contract or as creditor of the company, except only his contractual status as stcokholder. A stockholder has no legal title to the profits of a corporate business until a dividend has been declared and therefore such profits are not the subject of barter or exchange between company and stockholder.

The situation in which the petitioner finds itself is brought on by the manner in which the transaction was handled in 1928, by the petitioner and the Wilputtes. At that time they saw fit to so transact the affair here involved that what the Wilputtes received (aside from the receipt of consideration for the stock in the Wilputte Coke Oven Corporation) should be and was received not directly from the corporation as a plain consideration upon an exchange of patents for the liquid assets of the corporation, but indirectly through the medium of the formation of a subsidiary company, transfer of the liquid assets to it, issuance of its stock to the parent corporation and distribution of said stock by the parent corporation as a dividend, to the Wilputtes. Whether designedly or otherwise, the result of this method of handling the matter was that it was a nontaxable receipt by the Wilputtes—of a dividend of stock in a corporation a party to a reorganization; for we hold that there was a reorganization under section 112 (i) (1) .(B), Act of 1928, for there was a transfer by a corporation of a part of its assets to another, and under the record in this case we consider it inescapable that immediately "after the transfer the transferor or its stockholders" (the Wilputtes) were "in control of the corporation to which the assets were transferred." It is equally obvious that section 112 (g) applies to this situation, since stock in "another corporation a party to the reorganization" was distributed in pursuance of a plan of reorganization and "without the surrender by such shareholder of stock or securities in such corporation", and there was therefore no gain to the distributees (the Wilputtes), who did not surrender their stock. It is true that they sold their stock in the parent corporation for a consideration in cash and notes, but under the theory of the whole transaction this was after the reorganization was completed and was a separate transaction.

The parties, having arranged that the Wilputtes should receive their *quid pro quo* through a subsidiary corporation as a nontaxable dividend in stock distributed, should not now be permitted to execute a volte-face and to say that such dividend was a consideration for an exchange. We conclude that the patents were a gift to the

306

corporation, as contended by the respondent. The entire record in this case convinces us that such was the intention and theory at that time and only upon such a theory can the tax returns made by the Wilputtes be explained, if they were made in good faith. The basis therefore remained the same as in the hands of the donors. Sec. 113 (a) (2), Act of 1928. It follows that the petitioner is not entitled, for purposes of depreciation or amortization, to the basis contended for; and, the cost of the acquisition of the patents to the donors or their predecessors in title, if any, not being shown, the petitioner is not entitled to the deductions claimed for depreciation on said patents for the years 1928, 1929, and 1930, and the action of the respondent in disallowing the same and in increasing in the amount thereof the taxable income of the petitioner for 1930 is accordingly approved.

*Decision will be entered for the respondent.*